IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Thomas Lee Fant, | ) | C/A No.: 1:14-4482-BHH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a
Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)
(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to
obtain judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI"). The two issues before the court are whether the
Commissioner's findings of fact are supported by substantial evidence and whether she
applied the proper legal standards. For the reasons that follow, the undersigned
recommends that the Commissioner's decision be affirmed.

I.      Relevant Background

        A.      Procedural History

        On September 28, 2011, Plaintiff protectively filed applications for DIB and SSI
in which he alleged his disability began on January 6, 2011. Tr. at 85, 97, 159–65, 166–
74. His applications were denied initially and upon reconsideration. Tr. at 140–44, 148–

50, 152–53. On July 15, 2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ann G. Paschall. Tr. at 52–84 (Hr'g Tr.). The ALJ issued an unfavorable decision on August 22, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 17–33. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 3–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on November 20, 2014. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 43 years old at the time of the hearing. Tr. at 56. He completed the eleventh grade. *Id.* His past relevant work ("PRW") included work on an appliance assembly line and as a sanitation worker and tow machine operator. Tr. at 80. He alleges he has been unable to work since January 6, 2011. Tr. at 20.

2.    Medical History

Plaintiff underwent outpatient surgery for bilateral inguinal hernia repair with mesh on June 23, 2006. Tr. at 323.

On November 20, 2010, Plaintiff presented to the emergency department at AnMed Health after having been injured in a motor vehicle accident. Tr. at 343. He stated he was hit on the driver's side of his vehicle by another driver who attempted to turn in front of him. *Id.* Plaintiff complained of mild pain on the right side of his neck and an abrasion on his left hand. *Id.* He denied head injury, loss of consciousness, pain or

numbness in his arms, or other injury. *Id.* The physical examination was normal, except for a few abrasions on Plaintiff's left hand. Tr. at 344. An x-ray of Plaintiff's cervical spine revealed no fracture or dislocation. *Id.* Plaintiff was diagnosed with a cervical strain and abrasion and discharged to his home with prescriptions for Flexeril and Ibuprofen. Tr. at 345.

Plaintiff presented to Stuart M. Barnes, M.D. ("Dr. Barnes"), for a consultative examination on November 9, 2011. Tr. at 355–57. Dr. Barnes indicated Plaintiff had a closed head injury in 1991 secondary to a motor vehicle accident. Tr. at 355. Plaintiff reported persistent right-sided weakness with occasional numbness and reduced grip strength in his right hand. *Id.* He also complained of some difficulty with word-retrieval. *Id.* He indicated he was released from his job at Electrolux in January 2011 because he was unable to keep up on the job. Tr. at 356. He indicated he was let go from a subsequent job because he was unable to lift 70-pound bags of material. *Id.* Plaintiff indicated he microwaved meals, performed household chores, and mowed his yard, but did not cook because he forgot things and allowed them to burn. *Id.* Plaintiff had a slightly flat affect, but normal communication skills. *Id.* He had difficulty remembering objects, but was able to spell three words forward and two of the three words backwards. *Id.* He was able to count down by serial 3s, calculate a simple cash transaction, and recall the date, day, location, and the name of the President. *Id.* Plaintiff had normal gait and normal range of motion ("ROM") of his shoulders, elbows, and wrists on both sides. Tr. at 356–57. He had normal ROM of his bilateral thumbs and all digits on both hands. Tr. at 357. His right grip strength was 4/5 and his left grip strength was 5/5. *Id.* His right

3

shoulder supraspinatus strength was 4/5 and his left shoulder supraspinatus strength was 5/5. *Id.* He had normal ROM in his bilateral lower extremities. *Id.* Strength testing indicated 5/5 flexors and extensors on Plaintiff's left side, but 4/5 extensors on his right side. *Id.* Plaintiff was able to perform a full squat and heel, toe, and tandem walks. *Id.* He had normal balance on his left leg and fair balance on his right leg. *Id.* He demonstrated no tremor or sensory deficits. *Id.* He had some clumsiness on the right side with rapid alternating movements and slightly increased reflexes in his right patella. *Id.* He had normal ROM of his cervical and lumbar spines. *Id.* Dr. Barnes assessed history of closed-head injury with mild right hemiparesis and recommended a full psychological evaluation to assess Plaintiff's cognitive functioning. *Id.* He indicated he believed Plaintiff would be a candidate for vocational rehabilitation. *Id.*

Plaintiff presented to Robin L. Moody, Ph. D., LPC ("Dr. Moody"), for a psychological consultative examination on November 30, 2011. Tr. at 359. Plaintiff reported he could no longer manage his finances or cook. *Id.* He stated he had difficulty retrieving words, often confused items, forgot how to perform tasks he could perform in the past, and had difficulty organizing and planning. *Id.* He indicated he slept for an average of four hours at a time. *Id.* He reported he did not like to sleep at night because he saw shadows that bothered him. Tr. at 360. He endorsed racing thoughts and visual and auditory hallucinations. *Id.* He indicated he no longer drove because he became confused by directions and often forgot where he was going. *Id.* He stated he completed light chores, but indicated his sister brought him food, washed his clothes, and paid his bills. *Id.* He endorsed abilities to bathe and dress himself. *Id.* Plaintiff indicated he last

worked at Michelin as a trash sorter, but stated he was previously fired from Milliken for forgetting to go to work. *Id.* Dr. Moody indicated Plaintiff struggled to retrieve words and recall information and had very delayed response times. Tr. at 360–61. Plaintiff had a restricted affect and slowed thought process, but Dr. Moody indicated his attitude was very cooperative. Tr. at 361. Plaintiff demonstrated very poor remote memory and fair short-term memory. *Id.* His concentration was impaired. *Id.* He scored 24 of a possible 30 points on the Folstein Mini-Mental State Exam ("MMSE"). Dr. Moody provided the following clinical functional assessment:

> Mr. Fant can complete chores, prepare simple meals and does not drive a car anymore. He has strong relationships with his immediate family. He leaves the house approximately two or three times a week to accompany his sister on errands or to spent time with family. He has one close family friend that he visits with occasionally. His concentration is very impaired. His pace and persistence are adequate. He can carry out simple instructions. He cannot manage his funds at this time as he often forgets to pay bills. He did not appear to exaggerate symptoms.

*Id.* Dr. Moody administered the Wechsler Adult Intelligence Scale–Fourth Edition ("WAIS–IV"), and Plaintiff achieved the following scores: 68 for verbal comprehension, 60 for perceptual reasoning, 58 for working memory, 50 for processing speed, and 53 for full-scale IQ. *Id.* All of Plaintiff's scores were indicated to be "very deficient." *Id.* Dr. Moody also administered the Wide Range Achievement Test–Fourth Edition ("WRAT–4"). Tr. at 362. Plaintiff's scores reflected word reading on a low-fifth grade level, sentence comprehension on a high-seventh grade level, spelling on a mid-fifth grade level, math computation on a high-fourth grade level, and reading composite in the deficient range. *Id.* Dr. Moody concluded as follows:

> Mr. Fant appears to be suffering from dementia due to a TBI. He struggles to recall previous information and can no longer repair electronics or manage his funds as he did in the past. He has documented medical reports of aphasia and comments that he has difficulty retrieving words he wants to use. He has some disturbance of functioning in that he put transmission fluid in the car instead of oil; and his light bill in the refrigerator. He can't manage to pay his bills on time and was fired from his last job for forgetting which day he was to return to work following a holiday. He gets very disoriented while driving and frequently gets lost or does not know where is he, therefore he has stopped driving. He does not appear depressed as he socializes, denies any appetite changes, denies depressed mood, denies any suicidal ideations, etc. However, he does report hallucinations which are most likely due to his TBI. He denies any command hallucinations. He has an 11th graded [sic] education and probably was below-average prior to the accident. Now his processing speed is severely impaired. The test scores are consistent with his current functioning.

Tr. at 362–63. Dr. Moody assessed dementia due to a traumatic brain injury ("TBI"), with behavioral disturbance, and deficient intelligence. Tr. at 363. She also assessed a global assessment of functioning ("GAF")[1] score of 50.

On December 1, 2011, state agency medical consultant Arthur Schiff, M.D. ("Dr. Schiff"), reviewed Plaintiff's records and completed a physical residual functional capacity ("RFC") assessment. Tr. at 92–94. He indicated Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a

---

[1] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000. The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.* A GAF score may reflect the severity of a claimant's functioning or his impairment in functioning at the time the GAF score is assessed, but it is not meaningful without additional context. *See Parker v. Astrue*, 664 F. Supp. 2d 544, 557 (D.S.C. 2009) (stating that "Plaintiff's GAF score is only a snapshot in time, and not indicative of Plaintiff's long term level of functioning.").

total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently push and pull with his right upper and lower extremities; frequently climb ramps/stairs/ladders/ropes/scaffolds, balance, and crouch; and frequently reach, handle, and finger with his right upper extremity. *Id.* State agency consultant Robert H. Heilpern, M.D. ("Dr. Heilpern"), indicated the same restrictions in an RFC on April 11, 2012. Tr. at 119–21.

State agency consultant Xanthia Harkness, Ph. D. ("Dr. Harkness"), reviewed Plaintiff's record and completed a psychiatric review technique ("PRT") on January 3, 2012. Tr. at 101–03. She considered Listing 12.02 for organic mental disorders and found Plaintiff to have mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Tr. at 101–02. State agency consultant Robert Estock, M.D. ("Dr. Estock"), provided the same impressions on April 11, 2012. Tr. at 115–17.

3.    School Records

Plaintiff's report from the South Carolina Test of Basic Skills dated May 1981 showed him to have low scores and to have responded correctly less than half of the time on the reading and math tests. Tr. at 290. Plaintiff achieved one-and-a-half of a possible four points on the writing subtest, which meant his score fell between "barely understandable" and "less than adequate." *Id.*

A student report dated May 1986 indicates Plaintiff scored 600 points on the mathematics section of the South Carolina Basic Skills Assessment Program ("SCBSAP"). Tr. at 287. The report indicates Plaintiff's score was below the state

standard of 700 points. *Id.* Plaintiff scored 599 points on the reading portion of the SCBSAP, which was also below the state standard of 700 points. *Id.* Plaintiff also scored below the state average of 3.0 on the writing section of the SCBSAP, achieving a score of 1.5. *Id.* He was instructed to enroll in a remedial mathematics, reading, and writing courses and to take the tests again. *Id.*

Plaintiff took the SCBSAP again in May 1986. Tr. at 292. His mathematics score dropped to 557. *Id.* His reading score improved to 655 and his writing score improved to 2.0, but he still failed to meet the state standards. *Id.*

Plaintiff's high school grades reflect a significant number of absences and declining grades from the ninth to the tenth grade. Tr. at 293. Plaintiff withdrew from school in January 1988, when he was enrolled in the tenth grade for a second year. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on July 15, 2013, Plaintiff testified he lived alone in a house. Tr. at 56. He indicated he had a driver's license, but had not driven in over a year-and-a-half. *Id.* He stated his sister or brother-in-law typically drove him to the grocery store and to appointments, helped him to shop for groceries, prepared his meals, helped him wash and fold his clothes, paid his bills, and checked on him during the day. Tr. at 63–65.

Plaintiff testified he worked for two years in the bakery at Kroger, where he sanitized machines and cleaned the floor, and off-and-on for three years for Elecrolux, where he assembled refrigerators. Tr. at 59. He stated he last worked for Milliken for

approximately a year as a tugger driver. Tr. at 60. He indicated he was terminated from that job because his employer was closed for the Thanksgiving holiday and he forgot to return to work until Christmas. *Id.* He stated he had difficulty performing the job over the prior six-month period and received complaints from his supervisor. Tr. at 61–62.

Plaintiff testified he sustained a brain injury in 1991. Tr. at 56–57. He indicated he continued to experience headaches every other week and weakness on his right side. Tr. at 69. Plaintiff testified that his condition was getting worse. Tr. at 71. He indicated he could work for less than an hour at a time. Tr. at 72.

Plaintiff testified he could prepare his own sandwiches and heat food in the microwave. Tr. at 66–67. He indicated he walked around his yard, sat outside in a chair, and watched television during a typical day. Tr. at 67. He stated he read the newspaper headlines and checked the weather report. Tr. at 68. He indicated he sometimes swept and mopped. Tr. at 69. He testified he stopped using his stove because he was burning food nearly every day. Tr. at 70.

b.    Witness' Testimony

Plaintiff's sister Mary Louise Johnson ("Mrs. Johnson") testified Plaintiff experienced swelling, left-sided weakness, a "cocked eye," and memory problems following his 1991 accident. Tr. at 74. She stated Plaintiff's symptoms had worsened since the car accident. *Id.* Mrs. Johnson indicated Plaintiff had difficulty performing his job at Milliken because of the weakness on one side of his body. Tr. at 75. She testified Plaintiff stopped driving a few months after he was terminated from his job at Milliken because he was forgetting where he was going. Tr. at 75–76.

9

Mrs. Johnson indicated she checked on Plaintiff daily during the time he was employed at Milliken, but did so more often after he stopped working. 74, 76. She stated she typically stayed with Plaintiff from 7:00 or 8:00 a.m. until 2:00 p.m. Tr. at 77. She indicated her daughter visited Plaintiff between 3:00 and 5:00 p.m. daily and her husband visited after her daughter left. *Id.* Mrs. Johnson indicated she prepared Plaintiff's meals because he nearly burned down his house. *Id.* She stated Plaintiff did a little bit of housework, but that she did most of the cleaning in his house. Tr. at 78. She indicated she took Plaintiff to the grocery store, to church, and to the emergency room and minor care facility. *Id.* She stated she paid Plaintiff's bills. Tr. at 79.

c.    Vocational Expert Testimony

Vocational Expert ("VE") Benson Hecker reviewed the record and testified at the hearing. Tr. at 79. The VE categorized Plaintiff's PRW at Electrolux[2] as light with a specific vocational preparation ("SVP") of two. Tr. at 80. He stated Plaintiff's sanitation work at the grocery store and his work as a tow machine operator were medium with an SVP of two. Tr. at 80. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work that required lifting a maximum of 10 pounds frequently and 20 pounds occasionally and sitting, standing, and walking for six hours each during an eight hour day; could frequently use his right dominant arm for

---

[2] The transcript does not reflect a job title or *DOT* number for this position. The VE stated "[h]e worked as th appliance at the Electrolux. Would be light, 2." Tr. at 80. Although the ALJ classified Plaintiff's PRW as that of "appliance worker" in her decision, the undersigned is unable to find such a position in the *DOT* or any other position that starts with "appliance" with an exertional level of "light" and an SVP of two.

hand controls, pushing, and pulling; could frequently use his right leg for foot controls; could frequently handle, finger, and reach with his right hand and arm; should avoid exposure to dangerous machinery or unprotected heights; should not use ladders; could frequently use stairs, balance, and crouch; was limited to simple, repetitive tasks and instructions that were consistent with engaging in reading and math on no more than a fifth grade level. Tr. at 80–81. The VE testified that the hypothetical individual could perform the appliance work Plaintiff performed in the past. Tr. at 81. The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. *Id.* The VE identified light and unskilled jobs as a packer, *DOT* number 753.687-038, with 676,000 positions nationally and 9,800 positions in South Carolina; a marker/pricer, *DOT* number 209.587-034, with 1,700,000 positions nationally and 23,000 positions in South Carolina; and a trimmer, *DOT* number 781.687-070, with 17,000 positions nationally and 250 positions in South Carolina. *Id.* The ALJ asked the VE if the identified jobs would accommodate an individual who could only work at a low production pace. *Id.* The VE indicated they would accommodate a low production pace. *Id.* The ALJ asked if the jobs could be performed if the individual could not maintain attention and focus or stay on task for as much as two hours at a time. *Id.* The VE testified they would not and that no other jobs would be available. *Id.* The ALJ asked if the jobs would be available if the individual would need more than the usual number of breaks during the workday. Tr. at 82. The VE testified they would not. *Id.* The ALJ asked if the identified jobs or any other jobs would be available if the individual could not

consistently work eight hours per day, five days a week, or would miss three or more days of work per month. *Id.* The VE testified no jobs would be available. *Id.*

        2.      The ALJ's Findings

In her decision dated August 22, 2013, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2016.

2. The claimant has not engaged in substantial gainful activity since January 6, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: mild right-sided hemiparesis and dementia due to traumatic brain injury (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform light work as defined 20 CFR 404.1567(b) and 416.967(b) except he can frequently use the dominant right-arm for hand controls, pushing and pulling. Additionally, he can frequently use the right leg for foot controls. He can frequently handle, finger, and reach with the dominant right hand and arm. He must avoid all exposure to dangerous machinery and unprotected heights. He can never use ladders and frequently use stairs. He can frequently balance and crouch. Lastly, he is limited to simple, repetitive tasks and instructions that should be consistent with someone reading and performing math at no more than the 5th grade level. Any work should be low-production pace.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 6, 1969 and was 41 years old, which is defined as a younger individual at 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 6, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 22–28.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ ignored the work-preclusive limitations specified by Dr. Moody and neglected to weigh her opinion; and

2) the ALJ failed to assess the credibility of the lay witness.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A. Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series

of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*;

*Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Dr. Moody's Opinion

Plaintiff argues the ALJ ignored the work-preclusive limitations that Dr. Moody set forth in her examination report. [ECF No. 11 at 8]. He maintains the ALJ failed to acknowledge or discuss critical findings in Dr. Moody's report. *Id.* at 12. He contends the ALJ neglected to indicate the weight she accorded to Dr. Moody's opinion. *Id.* at 13.

The Commissioner argues the ALJ appropriately considered and assessed Dr. Moody's opinion. [ECF No. 12 at 10]. She maintains that Dr. Moody did not opine that Plaintiff had work-preclusive limitations or that he was unable to work. *Id.* The Commissioner argues that the ALJ was not required to specify the explicit weight she gave to Dr. Moody's opinion because a review of her decision showed the implicit weight she accorded it. *Id.* at 13. She maintains the ALJ "thoroughly discussed Dr. Moody's opinion, adopted Dr. Moody's diagnosis at step two, incorporated the credibly-established functional limitations assessed by Dr. Moody into her detailed RFC," and reached a decision that was "sufficiently detailed to permit meaningful district court review." *Id.* at 15.

The Social Security Administration's ("SSA's") rules require ALJs to carefully consider medical opinions on all issues. SSR 96-5p. If the ALJ declines to convey controlling weight to a treating physician's opinion or if the record does not contain a treating physician's opinion, the ALJ should consider "all of the following factors" to determine the weight to be accorded to every medical opinion in the record: whether an examining relationship exists between the claimant and the medical source; whether a treatment relationship exists, and, if it does, the length of the treatment relationship and frequency of examination and the nature and extent of the treatment relationship; the support for the opinion in the medical source's examination or treatment records or opinion statement; the consistency of the opinion with the record as a whole; the specialization of the medical source; and other factors. 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Johnson*, 434 F.3d at 654. This court has held that "an express

17

discussion of each factor is not required as long as the ALJ demonstrates that he applied the . . . factors and provides good reasons for his decision." *Hendrix v. Astrue*, C/A No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010). It is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

If an ALJ does not give controlling weight to a treating source's opinion, the ALJ's decision must explain the weight accorded to all opinion evidence in the record, including the opinions of treating sources, non-treating sources, examining sources, and state agency consultants. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). However, an ALJ's failure to expressly assign weight to a medical source's opinion may be considered harmless error if the weight assigned is evident from a review of the decision. *See Tanner v. Commissioner of Social Sec.*, 602 F. App'x 95, 100 (4th Cir. 2015) (finding no reversible error where it was clear from the ALJ's RFC assessment that he accepted most of the medical source's findings).

The ALJ indicated he considered the medical opinions of the claimant's treating physicians, evaluating physicians, and the state agency medical consultants pursuant to 20 C.F.R. §§ 404.1527 and 416.967 and SSRs 96-6p and 96-2p. Tr. at 27.

The ALJ specifically considered Dr. Moody's evaluation. Tr. at 23, 26. He wrote the following regarding Dr. Moody's findings:

Upon examination, the claimant appeared generally oriented and did not have any unusual mannerisms. He did struggle to recall information and retrieve words. His response time was very delayed. However, his speech was clear. His memory was very poor for remote events. Concentration was very impaired. He could complete serial 3's given time. He achieved a score of 24/30 on the Mini-Mental Status [sic] Examination. The claimant could complete chores, prepare simple meals and had strong relationships with his immediate family . . . . As such, his social functioning appears largely intact. Notably, although his concentration was impaired, his pace and persistence were adequate. He could carry out simple instructions.

*Id.*

The ALJ found there was "no evidence of an intervening organic event[5] in the medical records that would account for the poor performance on cognitive tasks or the deficits reported by the psychological consultative examiner in November 2011." Tr. at 27. She then stated she had restricted Plaintiff's "mental functioning in light of a moderate limitation in concentration, persistence, and pace." *Id.*

The undersigned recommends the court find the ALJ adequately considered and weighed the relevant factors under 20 C.F.R. §§ 404.1527(c) and 416.927(c) in assessing Dr. Moody's evaluation and opinion. In acknowledging that "Dr. Robin Moody conducted a full psychological evaluation in late November 2011," the ALJ recognized the examining relationship between Plaintiff and Dr. Moody and Dr. Moody's psychological specialty. *See* Tr. at 26. She also impliedly conveyed that no treatment relationship existed between Plaintiff and Dr. Moody. *See id.* The ALJ weighed the

---

[5] The ALJ did not dispute the 1991 TBI, but indicated later in the paragraph that Plaintiff "was capable of working at substantial gainful activity levels after the car accident in an unskilled capacity." Tr. at 27. The ALJ indicated there was "no evidence of an intervening organic event" between the time Plaintiff was able to complete unskilled work and the time of Dr. Moody's evaluation. *See id.*

supportability of Dr. Moody's opinion by restating her significant findings, the results of the tests she conducted, and the diagnoses she assessed. *See id.* She found that some of Dr. Moody's findings were internally inconsistent. *See id.* ("Notably, although his concentration was impaired, his pace and persistence were adequate" and "[h]e could carry out simple instructions"). In pointing out that there was "no evidence of an intervening organic event," the ALJ concluded that the results of cognitive testing[6] were inconsistent with the record as a whole, which reflected Plaintiff had been able to perform unskilled work until 2011. *See* Tr. at 27.

Plaintiff cites several cases to support his argument that ALJs are required to explicitly weigh medical source opinions. [ECF No. 11 at 13–14]. However, all of these decisions predate the Fourth Circuit's recent decision in *Tanner*, which holds that an ALJ's failure to explicitly weigh the opinion evidence is harmless if the weight assigned can be gleaned from a review of the decision as a whole. Here, the ALJ erred in failing to explicitly state the weight she accorded to Dr. Moody's opinion, but her error is harmless because a review of the decision as a whole reveals the weight she accorded to Dr. Moody's opinion. *See Tanner*, 602 F. App'x at 100. The ALJ gave significant weight to some of Dr. Moody's findings by adopting them as part of the RFC. *Compare* Tr. at 24 ("he is limited to simple, repetitive tasks and instructions that should be consistent with someone reading and performing math on no more than the 5th grade level" and to work at a "low production pace"), *with* Tr. at 361 (adequate pace and persistence and ability to

_____

[6] Although the ALJ did not reference Plaintiff's precise scores on the WAIS–IV, she did indicate that Dr. Moody's testing revealed poor performance on cognitive tasks and deficits. Tr. at 27.

carry out simple instructions), 362 (WRAT–4 scores on a fifth grade level in word reading and on a high-fourth grade level in math computation, and 363 (impaired processing speed). Although the ALJ did not adopt Dr. Moody's findings that Plaintiff had "very impaired" concentration and significant deficits on cognitive tasks, she explained her reasons for failing to adopt those restrictions. *See* Tr. at 26 (finding impaired concentration and poor functioning on cognitive tasks to be inconsistent with Dr. Moody's other findings, a lack of treatment or testing, and a lack of any intervening event to explain the deficits since Plaintiff was able to engage in unskilled work). A review of the decision reveals that the ALJ gave significant weight to Dr. Moody's findings that she found to be supported by substantial evidence, but rejected those findings she found to be in conflict with Dr. Moody's other findings and the record as a whole.

Plaintiff also argues the ALJ erred in failing to address all the findings and limitations set forth in Dr. Moody's evaluation. [ECF No. 13 at 3–4]. In *Reid v. Commissioner*, 769 F.3d 861, 865 (4th Cir. 2014), the Fourth Circuit rejected a similar argument. The court stated "[w]hile the Commissioner's decision must 'contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based,' 42 U.S.C. § 405(b)(1), 'there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision.'" *Reid*, 769 F.3d at 865, citing *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam); *accord Russell v. Chater*, No. 94-2371, 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (per

curiam) (explaining that this Court has not "established an inflexible rule requiring an exhaustive point-by-point discussion in all cases"). However, in *Dutton v. Colvin*, C/A No. 1:14-1779-BHH-SVH, 2015 WL 1733799, at *13 (D.S.C. Apr. 16, 2015), this court distinguished the plaintiff's argument from the circumstances presented in *Reid* because the plaintiff cited a specific opinion and report the ALJ failed to consider anywhere in his decision. *Dutton*, 2015 WL 1733799, at *11–14. Based on the ALJ's failure to cite or discuss the report or any of the functional limitations it indicated, the court rejected the Commissioner's argument that the ALJ impliedly considered the opinion based on his statement that he carefully considered the entire record. *Id.* at 13–14.

Here, as in *Dutton*, Plaintiff points to specific evidence he does not believe was adequately considered by the ALJ, including the full-scale IQ score assessed by Dr. Moody, his failure to pay his bills on time, his reason for being fired from his last job, his impaired processing speed, and his GAF score. [ECF No. 11 at 12–13]. However, unlike in *Dutton*, here, the ALJ explicitly considered the opinion at issue. The undersigned did not intend and does not interpret *Dutton* to require remand any time a plaintiff points to specific impressions that an ALJ failed to discuss. Such an interpretation conflicts with the Fourth Circuit's holding in *Reed* and would create an insurmountable burden for ALJs to engage in the onerous task of analyzing every impression in every report of record. Based upon a reading of the ALJ's decision, it is sufficiently clear that the ALJ considered the findings and functional limitations indicated in Dr. Moody's report and explained her reasons for accepting some and rejecting others.

In light of the foregoing, the undersigned recommends the court find the ALJ carefully considered Dr. Moody's opinion, implicitly explained the weight she accorded to the opinion in accordance with 20 C.F.R. §§ 404.1527(e)(2)(ii) and 416.927(e)(2)(ii), and supported the weight she gave to the opinion with substantial evidence in the record.

2.     Lay Witness Testimony

Plaintiff argues the ALJ failed to assess the credibility of Mrs. Johnson's testimony. [ECF No. 11 at 15–16]. He maintains Mrs. Johnson's testimony provided information that was not offered in his testimony and should have been considered independently. *Id.* at 16.

The Commissioner argues the ALJ considered the witness' testimony, but rejected it because it was duplicative of Plaintiff's testimony, which she found to be not entirely credible. [ECF No. 12 at 16]. She maintains that "[b]ecause the ALJ summarized Ms. Johnson's testimony, and indicated that she considered Ms. Johnson's testimony (Tr. 25), and because her testimony was duplicative of testimony that the ALJ found not entirely credible, Plaintiff's argument has no merit." *Id.* at 17.

"[T]he ALJ must consider the relevant medical evidence and other evidence of the claimant's condition in the record, including testimony from the claimant and family members." *Morgan v. Barnhart*, 142 F. App'x 716, 720 (4th Cir. 2005), citing 20 C.F.R. § 404.1529(c)(3). "Where a lay witness's testimony merely repeats the allegations of a plaintiff's own testimony and is likewise contradicted by the same objective evidence discrediting the plaintiff's testimony, specific reasons are not necessary for dismissing the lay witness's testimony." *James v. Astrue*, C/A No. 3:11-635-CMC-JRM, 2012 WL

23

3877695, at *10 (D.S.C. Aug. 16, 2012), citing *Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir. 1995); *Carlson v. Shalala*, 999 F.2d 180 (7th Cir. 1993); *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992); *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984). However, when a lay witness provides information in addition to the claimant's testimony, the ALJ is required to weigh the lay testimony and articulate reasons for rejecting or accepting it. *Id.* In *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975), the court stated that it was the Commissioner's "prerogative to assess the credibility of witnesses." *See also Hays*, 907 F.2d at 1456. The court subsequently provided that "such determinations will not be discounted except under extraordinary circumstances." *Parker v. Bowen*, 838 F.2d 467 (Table), 1988 WL 6817, at *1 (4th Cir. 1988).

The ALJ acknowledged and summarized Mrs. Johnson's testimony. Tr. at 25. She indicated Mrs. Johnson testified that Plaintiff's condition had changed since his 1991 car accident and that he had weakness and difficulty remembering. *Id.* She also acknowledged Mrs. Johnson's testimony regarding the tasks she performed for Plaintiff and the fact that family members were with Plaintiff or checked on him throughout the day. *Id.*

The ALJ found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible, but she did not explicitly assess the credibility of Mrs. Johnson's statements. *See id.*

The record reflects the ALJ considered Mrs. Johnson's statements. *See* Tr. at 25. The question is whether the ALJ adequately assessed Mrs. Johnson's credibility. The

undersigned's review of the record reveals that the vast majority of Mrs. Johnson's testimony was duplicative of Plaintiff's testimony. *Compare* Tr. at 63–65 (Plaintiff testified his sister drove him to the grocery store and to appointments, helped him shop for groceries, prepared his meals, washed and folded his clothes, paid his bills, and checked on him during the day), 61–62 (Plaintiff stated he had difficulty performing his job at Milliken before he was terminated for failing to return to work after the Thanksgiving break) 66–67, 70 (Plaintiff indicated he could prepare sandwiches, heat food in the microwave, and clean his floor, but stated he no longer used the stove because he had frequently burned food and his family members were concerned), and 71 (Plaintiff testified his condition was getting worse), *with* Tr. at 74 (Mrs. Johnson stated Plaintiff's symptoms had worsened since the car accident), 75 (Mrs. Johnson indicated Plaintiff had difficulty performing his job at Milliken because of the weakness on one side of his body), 76–77 (Mrs. Johnson indicated she checked on Plaintiff and that she and other family members stayed with him during the day), 77 (Mrs. Johnson indicated she prepared Plaintiff's meals because he nearly burned down his house), 78 (Mrs. Johnson stated Plaintiff did a little bit of housework, but that she did most of the cleaning in his house and drove Plaintiff to the grocery store, to church, and to the emergency room and minor care facility), and 79 (Mrs. Johnson stated she paid Plaintiff's bills). In *James*, this court acknowledged that ALJs were not required to provide specific reasons for dismissing a lay witness' testimony where that testimony was merely duplicative of the plaintiff's testimony and the ALJ provided sufficient reasons for the determination regarding the plaintiff's credibility. *See James v. Astrue*, 2012 WL 3877695, at *10.

Plaintiff submits that the ALJ was required to make a specific credibility determination regarding Mrs. Johnson's testimony because she provided information in addition to his testimony. ECF Nos. 11 at 16–17 and 13 at 7–8. In particular, Plaintiff argues the ALJ neglected to address Mrs. Johnson's indication that his condition had worsened since he was involved in a car accident in 2010. *Id.* The following exchange occurred during Mrs. Johnson's testimony:

> ATTY:      All right. I don't need a lot of detail, but you remember in 1991 when he was in a bad car accident?
>
> WITNESS:  Yes, I do.
>
> ATTY:      Do you recall if there's been a change in his condition over all since that time?
>
> WITNESS:  A change?
>
> ATTY:      In his condition since he's had his car accident?
>
> WITNESS:  Well, the swelling, and everything it still comes back on him, and he has a weakness on his left side, and also his eye, his cocked eye and everything. He can't remember much.
>
> ATTY:      Has that gotten worse here recently?
>
> WITNESS:  It has. It was bad then, but it's gotten a lot worse, since the car accident.

Tr. at 73–74.

The undersigned rejects Plaintiff's argument for several reasons. First, although Plaintiff argues "the car accident" referenced in Mrs. Johnson's testimony was the 2010 car accident as opposed to the 1991 car accident, such an interpretation is not apparent from Mrs. Johnson's testimony. In fact, the only car accident specifically referenced in

the above exchange was the 1991 accident. *See* Tr. at 25. Therefore, it was reasonable for the ALJ to infer Mrs. Johnson was indicating Plaintiff's condition had worsened since the 1991 accident, which was consistent with and duplicative of Plaintiff's testimony. Next, even if the ALJ should have assumed Mrs. Johnson was referring to the 2010 car accident, her testimony was generally consistent with and duplicative of Plaintiff's testimony that his condition was getting worse. *See* Tr. at 71. Finally, if there is an appreciable distinction between Plaintiff's testimony that his symptoms were getting worse and Mrs. Johnson's testimony that his condition had worsened since the 2010 car accident, the ALJ addressed the 2010 car accident specifically and noted "there was no associated lost consciousness/dazed or memory impairment." Tr. at 26, citing Exhibit 1F. She later stated there was "no evidence of an intervening organic event in the medical records . . . ." Tr. at 27. Although the ALJ did not specifically acknowledge the alleged indication by Mrs. Johnson that Plaintiff's symptoms worsened as a result of the 2010 car accident, the ALJ concluded that the objective evidence did not suggest Plaintiff sustained an injury that would explain a decline in his cognitive functioning.

In light of the foregoing, the undersigned does not find that the ALJ's failure to explicitly assess Mrs. Johnson's credibility presents an extraordinary circumstance that authorize this court to disturb the Commissioner's "prerogative to assess the credibility of witnesses." *See Taylor*, 528 F.2d at 1156; *Parker*, 1988 WL 6817, at *1. The undersigned recommends the court find the ALJ's failure to assess the credibility of Mrs. Johnson's testimony to be harmless error because her testimony merely repeated the allegations of Plaintiff's own testimony and was contradicted by the same objective evidence. To the

extent that Mrs. Johnson's testimony possibly varied from Plaintiff's testimony with regard to the effect of the 2010 car accident, the undersigned recommends a finding that the ALJ impliedly gave that portion of her testimony little weight because she found the objective evidence did not support such a finding.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

August 28, 2015                              Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).